Marjorie B. Kirby, Administratrix, et al., Appellees, v. Dora C. Holman et al., Appellants.

No. 46884.

356

JANUARY 14, 1947.

REHEARING DENIED APRIL 11, 1947.

Ralph U. Woodcock, of Des Moines, and Carlos W. Goltz, of Sioux City, for appellants.

Boardman, Cartwright & Druker, of Marshalltown, for appellees.

MULRONEY, J.—The plaintiffs, who are residents of New York, own the Pilgrim Hotel in Marshalltown. This is a ninety-two-room, four-story hotel. Their agent in Marshalltown is the Fidelity Savings Bank of Marshalltown, Iowa, and Mr. Berkley, the vice president of that bank, was the officer in charge of the Kirby interest. On July 1, 1938, the plaintiffs sold the furniture and equipment in the hotel to the defendants, Dora C. Holman and her son L. Grant Holman, and leased the hotel building to the purchasers at a monthly rental of $300. The purchase price for the furniture and equipment was $16,000. The defendants paid $5,000 down and gave plaintiffs a note for $11,000, secured by a chattel mortgage on the furniture, equipment, and other personal property in the hotel or any additions thereto which defendants would bring into the hotel during their period of occupancy. The note provided for payment in monthly installments of $150. The lease provided that the lessor would care for the outside of the building but that lessee would make all repairs and improvements covering the interior. The defendants operated the hotel until in January 1942, when Grant, who was then twenty-five years old, enlisted in the Army. They

paid the rent but were in arrears in their installment payments on the chattel mortgage. In May of 1942 defendants made a payment of $5,281.64, of which payment $4,250 was credited on principal and $1,031.64 was credited on interest. This left a balance due of approximately $6,000. No further payment was made and in September 1942 plaintiffs started suit to foreclose the mortgage, which resulted in a judgment in rem and decree of foreclosure and the subsequent sale of the mortgaged chattels on special execution. On September 16, 1943, defendants filed, in the same foreclosure suit, their petition to vacate the decree.

The petition states that defendants seek an order vacating the decree, under the provisions of Rules 252 and 253, Iowa Rules of Civil Procedure, on the ground of irregularity or fraud practiced in obtaining the decree and unavoidable casualty or misfortune preventing them from defending. The defendants allege the proceedings were irregular in that the alleged jurisdiction in the foreclosure suit was obtained upon published notice, upon affidavit that defendants were nonresidents of Iowa and were residents of California, whereas both of said defendants were residents of Iowa. The petition also alleged that "the court was induced to sign and enter said decree of foreclosure upon an erroneous and false affidavit filed in said case by counsel for plaintiffs, alleging that neither of said defendants, insofar as known by said affiant, was at the time in military service of the United States, whereas in truth and fact it was known by plaintiffs and their duly authorized agents that L. Grant Holman was and had been in the service of the armed forces of the United States * * *." The petition asserted the entry of the judgment constituted a violation of Grant's rights under various provisions of the Soldiers' and Sailors' Civil Relief Act and alleged "that said defendants had at the time of the entry of said decree and now have a meritorious defense in whole or in part to said action"; it being claimed in the petition:

"That the said Dora C. Holman was deprived of the aid and assistance of said L. Grant Holman [by reason of his being in the Army] in the operation of said hotel business, and by reason of such fact the said defendants were granted, and it was agreed and understood that defendants would have, additional

time in which to make payments on said note as evidenced by said chattel mortgage which was undertaken to be foreclosed * * *."

Both the petition and supporting affidavit of defendants (required under Rule 253, Iowa Rules of Civil Procedure) assert that prior to their taking over the hotel business in 1942 the plaintiffs had received no rent for their hotel property for five years; that the property was run down and much in need of decoration and repairs and defendants spent large sums of money in decorating and repairing the building and they expended for new and additional equipment the sum of approximately $18,465:

"That in order to put the hotel on a paying basis by the securing of the necessary and essential patronage, it was necessary for the defendants to make the extensive improvements and additions herein stated, and that while the expenditures of such large sums of money depleted their cash and assets, and likewise impaired their ability to meet their obligations under the said lease and the said chattel mortgage, yet nevertheless such expenditures were made in full cooperation with the consent of M. C. Berkley, agent for the plaintiffs herein, and the terms of the said chattel mortgage and lease were modified and indefinitely extended by mutual agreement of all the parties under the circumstances. * * * Rental payments were continued until May of 1942 and in that month further payments were made upon the note and chattel mortgage obligation in amounts exceeding $5,280. By mutual agreement obligations for the suspension of rental and chattel mortgage payments were made between the parties herein although no reduction in the amount thereof was acceded to by the plaintiffs herein."

In general, it was the claim of defendants that by reason of their untiring efforts and the expenditures of large amounts of money they built up a prosperous hotel business, reasonably worth at the time of the foreclosure $30,000, and by reason of the "fraudulent and irregular and illegal proceedings" commenced when they were temporarily absent from the city they were deprived of an equitable interest in said business of $25,000.

The petition also alleged that plaintiffs had been operating the hotel business since the entry of the "illegal" decree by an agent and using their property; that they were still operating the business at the time of the filing of the petition on September 16, 1943, and that large profits had resulted from such operation for which defendants were entitled to a credit and that an accounting should be made by plaintiffs.

The prayer of the petition asked that the decree of foreclosure be set aside and vacated, or in any event it be corrected or modified, and that the court by an order require plaintiffs to render a full accounting of the moneys received since seizing the hotel property, in order that the court may thereby determine the profits, if any, that defendants are entitled to receive in the way of a credit to apply upon the indebtedness of defendants, and if deemed necessary to protect the legal and equitable rights of all parties in interest; that the court appoint a receiver to manage the hotel business; and for other and further equitable relief.

The plaintiffs did not answer the petition, relying upon the provisions of Rule 253(c) to the effect that such a petition "shall stand denied without answer." After hearing evidence the trial court made no findings of fact or conclusions of law but rendered a decree adverse to the defendants, the judgment entry simply stating the petition to set aside the decree "is denied."

Grant Holman was still in service at the time of the hearing on the petition. He testified that he had taken flying lessons before our entry into the war, and on January 28, 1942, he enlisted in the Air Corps. He knew Mr. Berkley and saw him before he left for service. In fact, he told Mr. Berkley the approximate date he intended to leave, the last of January, and said good-by to him. He testified that his father died in 1918, leaving him some land, and that, with a loan on this land, he and his mother bought the Pilgrim Hotel business in 1938 and went into active management. He testified that he signed the note, mortgage, and lease heretofore referred to. He testified to many purchases to improve the hotel, such as wallpaper,

paint, carpets, etc., and to the remodeling and extensive repairs to the heating and lighting system and the elevator. They opened a taproom, coffee shop, and barber shop, and in all he estimated he and his mother put into the hotel, in addition to the purchase price, $20,000. He testified that he made a memorandum from memory which was an itemized statement of his recollection of new equipment they had purchased and his recollection of the cost of each piece of equipment. The total of this list, which was in evidence, was $18,465. He was shown Exhibit 5, which was the foreclosure decree, which was as follows:

"Now on this 13th day of November, A. D. 1942, the above and foregoing matter coming on for hearing and trial before the Court in its regular order; the Plaintiffs appearing by BOARD-MAN & CARTWRIGHT, their attorneys, and the Defendants DORA C. HOLMAN and L. GRANT HOLMAN appearing by JAMES D. ROBERTSON, their attorney, and said matter having been fully tried, argued and submitted and the Court being duly advised in the premises.

"It is found, ordered, adjudged and decreed as follows:

"That on or about the 1st day of July, A.D., 1938, the Defendants DORA C. HOLMAN and LOUIS GRANT HOLMAN (also known as L. GRANT HOLMAN) made, executed and delivered to CHARLES C. KIRBY, MARGARET C. KIRBY CASEY and ARTHUR T. KIRBY their certain promissory note in the face amount of $11,000.00. That a true and correct copy of such promissory note is attached to Plaintiffs' Petition and made a part thereof as Exhibit '1.' That at the same time the said Defendants DORA C. HOLMAN and LOUIS GRANT HOLMAN executed and delivered to the same persons their chattel mortgage to secure the payment of the indebtedness evidenced by said promissory note. That a true and correct copy of said chattel mortgage so executed is attached to Plaintiffs' Petition as Exhibit '2.'

"That of the indebtedness evidenced by said promissory note and secured by said chattel mortgage there is unpaid $6,000.00 of principal with interest thereon at five per cent (5%) per annum from July 1, A.D., 1938.

"That the Plaintiffs are the owners of the note and mortgage described in Plaintiffs' Petition and the indebtedness is

justly due the Plaintiffs from the defendants DORA C. HOLMAN and LOUIS GRANT HOLMAN and Plaintiffs are entitled to the relief demanded and to the foreclosure of the chattel mortgage securing the said note.

"That the Plaintiffs have and recover judgment in rem against the property hereinafter described for the sum of $7,441.38 with interest thereon at the rate of six per cent (6%) per annum from the date hereof and for the costs of this action, including statutory attorney fees taxed at $114.41, and accruing costs herein.

"That the lien of Plaintiffs' chattel mortgage be confirmed and established as a valid and subsisting lien for the amount of said judgment and costs from the 1st day of July, A.D., 1938, upon the following described chattel property enumerated in said chattel mortgage, to wit:

"All furniture, furnishings, restaurant and hotel equipment, merchandise and store fixtures, billiard and pool tables, and other furniture, owned by DORA C. HOLMAN and LOUIS GRANT HOLMAN located in the building known as the Pilgrim Hotel, Marshalltown, Marshall County, Iowa, which is situated on the tract described as follows:

"Beginning at the Southwest Corner of Block Nine (9) of Marshalltown, thence North (N) 101 Feet, thence East (E) 164 Feet, thence South (S) 101 Feet, thence West (W) 164 Feet to the place of beginning, Marshall County, Iowa.

"That Plaintiffs' chattel mortgage described in said petition and set out by copy attached thereto be foreclosed and that special execution issue for the sale of said chattel property described in said chattel mortgage and enumerated in this Decree, or so much thereof as may be necessary to satisfy said judgment with interest and costs, as provided by law, and upon the sale of said property the Defendants DORA C. HOLMAN and L. GRANT HOLMAN and all persons claiming by, through, or under said Defendants are thereby forever barred and foreclosed of all rights, liens, interest or equity in and to the said mortgaged property and all the rights therein shall be fully terminated and ended thereby.

"That this cause be continued for service upon and judgment and decree against any parties necessary to full and complete determination of the issues herein, and of the rights of Plaintiffs in and to the aforedescribed personal property by virtue of the chattel mortgage foreclosed upon him.

"All done in open Court.

[Signed] B. F. Thomas, Judge."

Grant had pleaded:

"That at no time in the said foreclosure proceedings was he ever represented by counsel; that he never employed, retained or authorized any attorney to appear for him in the cause; that any appearance for him by Attorney Robertson was wholly unauthorized by him * * *."

With respect to the recitation in the decree that James D. Robertson appeared for him Grant testified that he did not engage Robertson to represent him in the suit. He testified he had known Robertson for a long time but he had never represented him. He had, in a general way, talked with Robertson about troubles he was having with Mr. Berkley for six or eight months before he went into the service. He saw him frequently around town, on the street and in the drugstore and at the airfield, where Robertson also took flying lessons. These talks were all casual and as friend to friend.

In August of 1942 Mrs. Holman went to California to be with Grant, who was then an aviation cadet taking preflight training. Grant testified that during this period of his military service he was drilling and studying from 5:30 in the morning until 10:30 at night. He was present with his mother one evening when she called Robertson and inquired about a notice that had been published in the Marshalltown paper. The housekeeper left in charge of the hotel had sent the notice to her. He heard her ask Robertson to look into the matter, and he testified:

"I took the phone and I said, 'How are you, Jim? We—as mother just explained to you, it looks like we are having a little trouble. We got a clipping. I didn't hear what you told mother. Do you know anything more about it?' He said, 'No.'

he didn't; he had read the slip of paper and heard a few comments of people around town; it looked like the Pilgrim Hotel was having a lawsuit. I said, 'Jim, you go and look into it for us and let us know what can be done.' He said, 'Yes, I will be glad to.' I said, 'Jim, I don't know, I suppose I could get leave to come home if I have to; we are awfully busy at the present time and I hate to ask for it.' I said, 'Anything you can do to let us know how critical this is or the basis of this whole thing—' I said, 'I would surely appreciate it.' I said, 'If I have to, I will try to get home.' I said, 'I will wait until I hear from you.' He said, 'O.K.' He said he would be glad to. I asked him at this time, 'How close are you to the service?' He said, 'Pretty darn close.' He said, 'I am not doing much law work at the present time.' He said, 'I am trying to study navigation and flying.' I said, 'I hope I have you under me sometime.' And I said, 'Let me know.' That is all the conversation."

The notice was undoubtedly the published notice of the foreclosure suit. The files in this case show that the first filing in the suit was an affidavit filed by E. N. Farber, plaintiffs' attorney, to the effect that he had made personal investigation of the whereabouts and places of residence of the defendants, and the affidavit stated:

"* * * that at the present time the defendants Dora C. Holman and L. Grant Holman (also known as Lewis Grant Holman) are residents of the State of California, and personal service of the original notice in this action cannot be made on either of these defendants within the State of Iowa in order to procure jurisdiction of them for the October, 1942, term of the above named court; and to obtain such jurisdiction for any purpose service of the original notice will have to be made by publication as provided by Section 11081 of the Code of Iowa."

This affidavit was filed in the clerk's office on September 10, 1942. The notice which was published was addressed to the defendants and notified them that a petition would be filed on October 2, 1942, praying for judgment against them on their

note and for foreclosure of the mortgage. Returning now to the testimony of Grant, we find that the May 1942 payment of $5,281.64 was from money he received from the sale of land his father had left him, which land was sold to the government for an air base at Sioux City. Grant returned to Marshalltown about October 13th on a ten-day furlough, which included travel time to and from his Army base at Santa Ana, California. When he returned his picture was published in the Marshalltown daily paper, with a write-up about his being home on furlough from the Army. While he was in Marshalltown he went to see Berkley but he testified Berkley seemed reluctant to give him any definite statement. Berkley said he would talk with Robertson and Grant's mother and try to come to some definite agreement and Grant said Berkley told him he had seen his picture in the paper and congratulated him on having a commission in the Army. While home on furlough Grant also saw Robertson and he testified Robertson told him that he had not come to any definite conclusion but that he would contact Mr. Berkley again and Grant's mother and see if the three of them could "thresh it out." Grant stated the talk then turned to flying and Robertson told him that he was doing a great deal of flying to build up quite a few hours so that he could get into the Air Corps; that he did not know if he would have enough time before he went to settle their argument with Berkley but, "He didn't want anything to do with a case in case there was one," and he stated he would not charge Grant anything for his advice; that he did not have time enough to take anything new on as far as the law practice was concerned. Grant testified he told Robertson about a conversation he had with a major in California regarding his rights under the Soldiers' and Sailors' Civil Relief Act and Robertson told him he would check on this act and see if it would cover his case. Grant left in a few days but he did not ever hear from Robertson again in connection with this case. His mother did not return to California with him.

The records in the district court show that on October 8, 1942, Attorney Robertson sent a letter addressed to the clerk, directing attention to this case, and stating:

"Will you kindly enter my general appearance for Dora C. Holman and Grant Holman, defendants in the above matter."

The clerk filed this letter in the records in the case on the same date, or October 8, 1942. Robertson, plaintiffs' witness, was asked by plaintiffs' attorney if he filed the above general appearance "at the request of the defendants," Dora Holman and Grant Holman, and he replied that he did, and he thought he obtained a rule copy of the petition at the same time. He was asked if he continued to give the matter attention until November 13, 1942, the date of the entry of the decree, and he replied that he did. However, on cross-examination he said he never saw the judgment or decree, Exhibit 5, until it was handed to him on the witness stand. He filed no papers in the case other than the letter to the clerk to enter his general appearance. He enlisted in the Army November 4, 1942, but it was his recollection that he did not actually leave for service until November 15th, but he stated he was not in the courtroom on November 13, 1942, when the decree was entered. His files contained a letter from plaintiffs' attorney, dated November 6, 1943, as follows:

"The court has assigned the above [Kirby v. Holman] case for trial on next Monday or Tuesday, whichever is more convenient to you. If you are not going to be here at that time, I wish you would so advise Mrs. Holman by wire, so that she may be represented by other counsel, if she so desires. The situation is one demanding quick action, since there is a lot involved and the security must be preserved."

There is no showing that he ever communicated the contents of this letter to Grant or to Mrs. Holman except his general statement that he notified them on everything that happened. On the date of this letter Grant had gone back to California and there is no showing that Robertson communicated with Grant after the receipt of this letter. Indeed, there is no showing that Robertson ever communicated or talked with Grant about this case except the two occasions Grant testified about when Grant talked with Robertson by telephone from California and when Grant talked to him when he was home on furlough. Robertson was not asked a single question about his conversa-

tion with Grant on these two occasions. He did not deny the statements Grant attributed to him to the effect that he would not be in a position to handle litigation; that he would only offer friendly advice; and that he was charging him nothing for his services. He testified he did not charge either of the defendants anything, but he did keep a record of the services, though he was unable to locate the record at the time of trial. He stated on re-direct examination: "I think that Grant told the truth substantially."

Before Dora C. Holman took the stand the parties stipulated that James D. Robertson and Dr. W. G. Rawley would, if they were present, testify as to her physical condition. On the part of Robertson it was stipulated that he would testify that when she talked with him she "was in a highly emotional condition; that she had recently had two operations in a hospital here in Marshalltown and was greatly worried about her son Lewis Grant Holman, and his being in the army." On the part of Dr. Rawley it was stipulated he would testify that when he examined Mrs. Holman in July of 1943 he found her "a nervous and high-strung woman of 54 years of age; that she was very emotional and crying most of the time while he was examining her and while she was relating her story; that said Mrs. Holman has had several serious operations and had arrived at the age of meno-pause very much a nervous wreck; that said Dr. Rawley would so testify if presented here in court."

Mrs. Holman flatly denied that she ever authorized Robertson to file any appearance for her in the case. She, too, testified as to the list of new property which they had bought, which Grant testified was made up from memory, and said she helped make out the list and it contained the things they had bought. She testified she did have the telephone conversation with Robertson when she was in California and a talk with him when she came back with Grant on October 13th. She did not return with Grant but on October 20th she said she called up Berkley and told him to come down to the hotel. She stated:

"Mr. Berkley came to the hotel in response to my call but I couldn't say whether he was down there twice that day

or not. I didn't tell him much of anything. I wanted him to know that he made it so tough for me that I didn't know which way to turn. * * * I figured I would tell Mr. Berkley I was going to California. He had been around and I hadn't been able to iron out anything with him and I left without making arrangements for anyone to look after these matters for me.''

She stated that she left for California that night and she later telegraphed to Robertson to get a box of personal belongings for her that was left in the hotel when she left. She stated that she was sick and worried at the time she left; worried over her own health, for she had recently been operated on for cancer; and worried about her son in the Army. She stated Robertson was always friendly to her; that he had visited her and her son in the hotel apartment and there he had said that she "had had so much trouble that he didn't expect to charge [her] for any services.''

She testified she was in Robertson's office when Berkley was there and they were trying to iron out the rent situation.

The defendants placed Mr. Berkley on the stand and he testified he was vice president of the Fidelity Savings Bank of Marshalltown; that the bank was agent for the plaintiffs; and that he was the officer in the bank who acted for plaintiffs with respect to this hotel property. It was stipulated the bank was the agent ''for looking after the Pilgrim Hotel, Marshalltown, the rental of the hotel, collection of rentals and the collection of the mortgage indebtedness and preserving the property''; that the bringing of the lawsuit was at plaintiffs' request and that everything was done with the knowledge and consent of plaintiffs. The record shows the property was sold at sheriff's sale for $4,999.59 and Berkley testified the property was sold to the ''Kirby heirs.'' Berkley testified the bank put a man in charge of the hotel when Mrs. Holman left on October 20, 1942, and the hotel was operated by plaintiffs until the hotel business was sold to the Milner Hotel Company on October 1, 1943. He stated that during the eleven months and nine days they operated the hotel they made a profit of, ''roughly $6,000, without counting any rent,'' and when it was sold the Milner Hotel Company

paid $12,000 for the property that had been obtained by the foreclosure. Mr. Berkley stated that he knew Grant was in the Army before the suit was started; that he talked with him when he was in uniform and back on furlough before the decree was taken. He stated that Mr. Farber, the attorney who started the foreclosure action, knew Grant was in the Army; that he knew that Farber had seen him; and that he and Farber had had conversations about Grant's being in the Army; he could not fix the dates of these conversations but he would say it was between May and October of 1942. He stated that Farber was the attorney for the plaintiffs at the time the suit was brought and acting for the plaintiffs and under his direction. At this point it would be well to set out an affidavit which was filed on October 3d with the petition in the case. It is as follows:

"I, E. N. Farber on oath say that I am the attorney for the plaintiffs in the above entitled cause; that I have no knowledge that the defendant or any of the defendants in said cause are in the military or naval service of the United States, and if said defendant or any of them are in such service I have no knowledge or information that would lead me to think he is or they are in such service.

E. N. Farber

Subscribed and sworn to before me by

E. N. Farber this 3d day of October, 1942

Kathryn Uschold, Notary Public."

Mr. Berkley testified to a number of conversations with Mrs. Holman and with Robertson—mostly about the matter of reducing the rent. He testified that Grant came to see him when he was back on furlough in October and they "discussed the foreclosure action and attempted to get the thing cleared up either by sale or having something done with it. No definite plan of procedure was arrived at." He was asked: "At the time you took over the business, Mr. Berkley, would you say it was a profitable enterprise?" And he replied: "I am under the impression it was more than breaking even."

The records in the foreclosure action show that after the

judgment of November 13th was rendered a special execution was issued and the sheriff levied on the property in the hotel and two publications were made of a sheriff's sale to be held on December 18, 1942. The record shows that the sheriff received but one bid, which was plaintiffs' bid for $4,956.19, plus sheriff's fees and costs, and the property was thereupon sold to plaintiffs.

I. Does the foregoing record show irregularity or fraud in obtaining the judgment? Defendants point to the first paper filed in the case. The affidavit for notice by publication states that defendants are residents of California and to obtain jurisdiction it will be necessary that service be made "by publication as provided by Section 11081 of the Code of Iowa." Section 11081, 1939 Code of Iowa, provides that service may be made by publication:

"(6) In actions which relate to or the subject of which is real or personal property in this state, when any defendant has or claims a lien or interest, actual or contingent, therein, or the relief demanded consists wholly or partly in excluding him from any interest therein, and such defendant is a *nonresident* of the state or a foreign corporation." (Italics supplied.)

This is the only paragraph of section 11081, Code of 1939, that fits plaintiffs' foreclosure action. Plaintiffs do not argue that the affidavit was true. The record shows Mrs. Holman's first trip to California was merely a visit. She left a going hotel business behind in Marshalltown, which the evidence shows was worth thirty or forty thousand dollars. Of course, a soldier's residence does not change when he enters service. The affidavit was false and the attorney making it must have known it was false. His client and plaintiffs' agent testified the attorney knew Grant was in the Army. He knew that Grant's residence had not changed to California by reason of his presence at an army base in that state. If the judgment is to be based on the published notice it was fraudulently obtained. As stated, plaintiffs do not argue the affidavit was anything else but false. Their argument is that the affidavit was unnecessary, mere surplusage, because, as plaintiffs argue: "If a defendant cannot be served in the State, publication of notice is authorized, irrespective of

his residence.'' The answer is that in the special kind of action plaintiffs were bringing service by publication could be had only on a nonresident of Iowa—and published notice of the pendency of this suit on an Iowa resident would be ineffectual to support jurisdiction. See Hartley v. Boynton, 8 Cir., Iowa, 17 F. 873, where there is a discussion of the necessity of showing nonresidence of defendants when the service is by publication under the antecedent statute of section 11081(6), Code, 1939. Plaintiffs state that in any event the affidavit and notice by publication are of no consequence for in this case the defendants appeared and were represented by competent counsel. This is plaintiffs' answer to nearly every proposition urged by defendants.

II. Was Attorney Robertson the duly authorized attorney representing defendant Grant Holman in this lawsuit? He says he was. On the witness stand he said his appearance was entered in the case for both defendants at their request. He entered his appearance October 8, 1942. At that time he had talked with Grant once. This was the long-distance telephone conversation when defendants were in California. If he was requested by Grant to appear for him in the lawsuit it must have been at the time Grant talked to him over the telephone for there is no record of any correspondence. Robertson was not asked any question concerning this telephone conversation. We must look to the testimony of defendants to find out what was said. All that Grant says he said was:

"Jim, you go and look into it [the lawsuit] and let us know what can be done. * * * Anything you can do to let us know how critical this is or the basis of this whole thing * * * I would surely appreciate it * * * If I have to, I will come home * * * I will wait until I hear from you * * * Let me know.'' Grant stated that Robertson replied: "O.K.'' and that "he said he would be glad to'' and when Grant asked him how close he was to the service he replied: "Pretty darn close * * * I am not doing much law work at the present time.'' Grant further testified: "I asked Mr. Robertson as a friend to look into this litigation and try to sometime in the future explain what was trying to be accomplished against my mother and

myself. * * * Q. You were hiring him then as an attorney?
A. No. Q. It wasn't your intention to hire him as an attorney?
A. Mr. Robertson himself cleared that up with this, saying
during the conversation it wasn't possible to hire him as an
attorney.''

There is much more testimony of defendants to the effect
that Robertson was merely asked to look into the case and ex-
plain it to them. After all, they had nothing but a clipping
that a petition would be filed on October 2d. When Grant came
back on his furlough and saw Robertson he stated Robertson
said he would try and settle the argument but "he didn't want
anything to do with a case in case there was one and he would
charge me nothing for any advice which he gave me," and
he said, "Any advice I give you is merely friend to friend,
because I don't have time enough at the present time to take
anything new on as far as law practice is concerned.''

This testimony stands undenied by Robertson. In fact,
Robertson says Grant told the truth substantially. That this
testimony falls far short of a request that Robertson enter his
general appearance in the case is too clear for words. While
there is a presumption that an attorney's appearance is author-
ized, it can be overcome by clear and satisfactory proof. Sloan v.
Jepson, 217 Iowa 1082, 252 N. W. 535. The evidence meets the
standard here.

We held in Fuehr v. Ewert & Richter Express & Storage
Co., 180 Iowa 518, 163 N. W. 347, that an attorney hired (1)
to settle the case (2) to give the matter attention (3) not to
get into a lawsuit had no authority to either enter a general ap-
pearance in the case or authorize another attorney residing in the
city where the action was brought to enter a general appearance in
the case. Assuming Robertson was actually "hired" by de-
fendants, it was merely to look into the case, perhaps to settle
the dispute if he could, but under this record he was not hired
to get into the lawsuit. See, also, Graettinger Tile Works v.
Paine, 202 Iowa 804, 211 N. W. 366.

Without discussing any more of the testimony, we think
it is clear that Robertson's appearance for Mrs. Holman was also

unauthorized. Mrs. Holman had more conversations with him but they seem to have been mostly about reducing the rent. It would not be necessary in order to have the decree in rem set aside to show it was unauthorized as to both defendants. As bearing thereon, see Town of Storm Lake v. Iowa Falls & Sioux City Ry. Co., 62 Iowa 218, 17 N. W. 489. Moreover—and this touches the claim of plaintiffs that they relied on Robertson's appearance to support their judgment—it appears that the judgment is in rem, and the last paragraph of the judgment decree continues the cause for service, presumably for complete determination. If plaintiffs relied upon the written general appearance of Robertson to support their decree, why did they not take personal judgment against defendants for the full amount of the note obligation? In any event, the decree being against the property it should be vacated if it is made to appear it is unauthorized as to a joint owner of the property. Thornily v. Prentice, 121 Iowa 89, 96 N. W. 728, 100 Am. St. Rep. 317; Rice v. Griffith, 9 Iowa 539; Yockey v. Woodbury County, 130 Iowa 412, 106 N. W. 950.

III. But, assuming either the service by publication was good or that the appearance by Robertson was authorized, was the judgment anything more than a default judgment? The recital in the decree that the case was "fully tried, argued and submitted" is of no consequence. The record shows no issue to try, no issue to argue, no issue to submit, as between the parties. There was no pleading on the part of defendants that raised any issue. There was no attorney in court representing defendants. The draftsman of the decree (plaintiffs' counsel) put therein a final clause, "All done in open Court," but the attorney, who the decree recites appeared for defendants, did not appear in "open court" the day the decree was rendered. He testified he might have been in the Army at the time, but in any event he knew he was not present "in open court" the day the decree was rendered and that he had never seen the decree until it was handed to him on the witness stand. We stated, in Peterson and Frost v. Kissell and Canning, 148 Iowa 516, 519, 125 N. W. 808, 809:

"A default is the failure to take the step required in the progress of an action, and a judgment by default is a judgment against the party who has failed to take such step."

Assuming the service or appearance was proper, then it is clear the judgment was a default judgment. Under the above definition it was a judgment against the defendants for failing to answer, which was the step "required in the progress of an action."

 IV. As a default judgment it violates section 200 of the Soldiers' and Sailors' Civil Relief Act, or 50 U.S.C., section 520(1). This section provides for the filing of an affidavit before default is taken, showing the defendant is not in military service, is in military service, or that plaintiff is not able to determine whether or not defendant is in military service. Here again the court's decree is based on a wholly false affidavit. The affidavit filed in this case by plaintiffs' attorney "that I have no knowledge that the defendants or any of the defendants in said cause are in the military * * * service" is branded false by his own client. Berkley's testimony that Farber knew Grant was in service before he filed the action shows the falsity of the affidavit. In the light of Berkley's testimony, fraud was practiced on the court to get a decree, in the filing of the affidavit in this case. Again plaintiffs do not argue the affidavit was anything else but false. They argue it was surplusage for the judgment was not a default but based on appearance. But the argument is not an answer. As we have pointed out, it can be a default judgment even though there was appearance. Moreover, plaintiffs recognized it as a default judgment by taking only a judgment in rem and, by the very act of filing an affidavit as to military service. No such affidavit is required under the Soldiers' and Sailors' Civil Relief Act unless the judgment taken was to be a default judgment. The filing of this false affidavit was a sufficient showing of fraud under Rule 252 that would warrant the granting of the relief prayed for.

 V. In any event, the default decree should be set aside under section 200(4), of the Soldiers' and Sailors' Civil Relief Act, 50 U.S.C., section 520(4). This section provides that in

any action where a default judgment has been rendered against one in military service the same can be set aside, on application filed within ninety days after his service, upon a showing that he has a meritorious defense and that he was prejudiced by reason of his service. The application in this case was filed while Grant was still in service. He pleaded he had a meritorious defense.

Plaintiffs argue that there is no ''showing'' that defendants have a meritorious defense ''except a statement in defendants' affidavits to that effect without setting forth the nature of such defense.'' As we read both the petition and supporting affidavits we learn that the defense which defendants would have pleaded would be an answer to the effect that the mortgage obligation was not due; that there was a mutual agreement between the parties for the suspension of the mortgage payments; that the consideration for this was the extensive improvements and additions which were made by defendants in co-operation with plaintiffs' agent, Mr. Berkley. While the pleading is a little vague as to the duration of the suspension, the petition indicates it was to continue during the period ''Dora C. Holman was deprived of the aid and assistance of said L. Grant Holman in the operation of said hotel business.'' Insofar as the Iowa statutes and Rules are applicable, it is well to point out Code section 12796, Code of 1939, was eliminated by Rule 252, Iowa Rules of Civil Procedure. This statute provided:

''The judgment shall not be vacated on motion or petition until it is adjudged there is a * * * defense to the action in which the judgment is rendered.''

Rule 253 merely provides that the petition shall allege a meritorious defense. The requirement that the petition allege a meritorious defense does not require the allegation of a defense which can be guaranteed to prevail at a trial and there need be no evidence to establish the defense. Under Rule 253(d) the court determines only the ''validity'' of the defense. It is enough if the petition presents facts from which it can be ascertained that the defendants have a sufficiently meritorious defense to entitle them to a trial of the issue at a proper ad-

versary proceeding. Olivera v. Grace, 19 Cal. 2d 570, 122 P. 2d 564, 140 A. L. R. 1328; McArdle Real Estate Co. v. McGowan, 109 N. J. Law 595, 163 A. 24. Ordinarily the defect that the petition does not sufficiently state the facts constituting a defense should be assailed by motion. We said, in Turner v. First Nat. Bk. of Keokuk, 30 Iowa 191, 193:

"It is true that the application [to set aside the judgment] does not state the facts constituting a defense to the action, and is otherwise informal and defective. But these were defects which might have been assailed at the proper time, by a motion for a more specific statement, or, possibly, by demurrer; and yet they cannot be made available in a trial on the merits, or by an objection on appeal."

VI. If the petition be taken as filed under the provisions of the Soldiers' and Sailors' Civil Relief Act (section 200(4) of the Act, or 50 U.S.C., section 520(4)), providing the defendant can move to have a default judgment against him vacated within ninety days of termination of military service where it appears he was prejudiced by reason of his military service in making his defense thereto, "provided it is made to appear that the defendant has a meritorious or legal defense to the action or some part thereof," there are three answers to the argument advanced by plaintiffs that there was an insufficient showing of the nature of the defense.

In the first place, the pleaded defense was sufficient. Of course, Mr. Berkley denied there was any extension or suspension of the chattel-mortgage payments. But in a hearing under this section of the Soldiers' and Sailors' Civil Relief Act the court does not decide the issue. The court would decide only if there be an issue between the parties which would entitle the defendant to a trial. The remedy granted under this section is to reopen the case to let in the defendant to defend.

Secondly, this section of the act provides for a showing that defendants have a "meritorious or *legal*" defense. (Italics supplied.) It must be read with other provisions of the act, and the act is to be construed liberally for the benefit of the serviceman to the end that the general purpose of the act be

carried out, namely, to protect those in military service and prevent injury to their civil rights during their term of service arising from judicial proceedings conducted against them in their absence. Section 100, Soldiers' and Sailors' Civil Relief Act, 50 U.S.C., section 510; Brown Service Ins. Co. v. King, 247 Ala. 311, 24 So. 2d 219. Under section 302 of the act, or 50 U.S.C., section 532, it is provided that in mortgage-foreclosure actions against servicemen the court may, on its own motion, and shall on the serviceman's motion, stay the proceedings or make other disposition of the case as may be equitable to conserve the interests of all parties, "unless in the opinion of the court the ability of the defendant to comply with the terms of the obligation is not materially affected by reason of his military service." Here there is an abundant showing that Grant's service affected his ability to pay the obligation. There is a complete showing that this case should and probably would have been disposed of without a decree and foreclosure sale if the court had even been apprised of the fact that Grant was in service. The property had been voluntarily turned over to the plaintiffs before judgment was taken. The case, even under the testimony of plaintiffs' agent, who stated the hotel business was making a profit at the time he took it over, and continued to make a profit almost equal to the mortgage obligation in nine months, was a perfect case for a receivership without foreclosure sale and the equities of all parties would have been preserved within the above act. In other words, the serviceman defendant did have a legal defense to the foreclosure judgment in rem, under section 532, even though he might owe every dollar of the mortgage obligation. Brown Service Ins. Co. v. King, supra, 247 Ala. 311, 24 So. 2d 219. In other words, the serviceman presented his legal defense, to which the plaintiffs' action would be exposed if the judgment were set aside.

Finally, under the facts in this case, it is doubtful if there need be any showing of a meritorious or legal defense. As a default judgment it could be rendered only upon a proper affidavit that defendant Grant Holman was not in service. Section 200 of the Act, or 50 U.S.C., section 520(1). Treating the

false affidavit of Attorney Farber as no affidavit, the serviceman should have a right to have the judgment set aside without the necessity of showing a meritorious defense if he can show his ability to pay the obligation was materially affected by reason of his military service. To hold otherwise would mean the statute requiring the affidavit could be ignored but the serviceman could not complain that he was denied the protection of the act because he did owe the obligation. This thought is expressed in Dahmen v. Gregory, 184 Misc. 724, 727, 55 N. Y. S. 2d 311, 313, where the court stated:

"The landlord in these summary proceedings omitted to file the required affidavit of military service and failed to secure an order from the court authorizing entry of the final order upon the tenant's default in appearance. Upon his discharge from military service the tenant was entitled to have the final order vacated notwithstanding his failure to show a meritorious defense to the proceedings. Subdivision 4 of section 303, which permits the opening of a default within ninety days of termination of military service where it appears that 'the defendant has a meritorious or legal defense', presupposes that the final determination was entered upon an order of the court first obtained, and then only after appointment of 'an attorney to represent defendant and protect his interest * * *.' A party may not enter a judgment or final order without regard to the requirements of the statute and then invoke subdivision 4 as a bar to its vacatur. Such practice, if sanctioned, would defeat the very purpose of the statute, which is so plainly designed to afford a person in military service some measure of protection before entry of the judgment or final order."

See, also, Bowery Sav. Bk. v. Pellegrino, 185 Misc. 912, 58 N. Y. S. 2d 771. In other words, the Soldiers' and Sailors' Civil Relief Act gives many legal defenses to servicemen in suits upon obligations they actually owe. It certainly is not within the spirit and intent of the act that they be deprived of these defenses when there is a showing that knowledge that a defendant was in service was fraudulently withheld from the court.

It would unduly lengthen this opinion were we to discuss defendants' ground of "unavoidable casualty" based largely on the fact that Robertson entered the service and Mrs. Holman was sick.

VII. ○We think defendants were entitled to the relief prayed for, under Rules 252 and 253, Iowa Rules of Civil Procedure, and under the provisions of the Soldiers' and Sailors' Civil Relief Act. Under the latter act the right to have the judgment vacated upon the proper showing, which we feel was made in this case, is absolute. Under Rules 252 and 253 the court exercises a discretion, for Rule 252 reads that the court "may correct, vacate or modify a final judgment." But the discretion is a judicial discretion, and upon a clear showing of fraud and irregularities practiced in obtaining the judgment, the judgment should be vacated. 31 Am. Jur. 267, section 717. The prayer of defendants' petition asks for an accounting of the profits and in effect restoration of the property sold in execution of the judgment and for general equitable relief. It is true, as stated in Restatement of the Law, Judgments, 545, section 113(d)g:

"Where property has been received as a result of a judgment improperly obtained equity may order the respondent to reconvey it or, if the property has been transferred to a third person, may order the respondent to pay the amount received therefor or its value. * * * If there was fraud or other fault in obtaining the judgment, complete indemnity is granted to the complainant and the respondent is permitted to make no profit from the improper judgment."

But Rule 253 provides such an action as this is an ordinary action triable to the court and we have frequently held it is an action at law. Shaw v. Addison, 236 Iowa 720, 18 N. W. 2d 796; McKee v. National Travelers Cas. Assn., 225 Iowa 1200, 282 N. W. 291.

The fact that the judgment has been satisfied on execution presents no obstacle to its being set aside. See Chambliss v. Hass, 125 Iowa 484, 492, 101 N. W. 153, 156, 68 L. R. A. 126,

3 Ann. Cas. 16, where this court, speaking through Justice Weaver, stated:

" * * * the satisfaction of the judgment by execution cannot be considered an acknowledgement of its finality or a waiver of the right to attack it for fraud."

Defendants' argument that the foreclosure sale was invalid because of the October 6, 1942, amendment to section 302, Soldiers' and Sailors' Civil Relief Act, or 50 U.S.C., section 532, goes to his right of restoration. Any rights of restoration which defendant might have would have to be asserted in an independent action. Chambliss v. Hass, supra. Without prejudice to defendants' rights in such proceedings, the cause is reversed for judgment vacating the foreclosure decree.— Reversed.

HALE, SMITH, BLISS, MANTZ, OLIVER, GARFIELD, and HAYS, JJ., concur.

WENNERSTRUM, C. J., concurs in result.